## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CHINYERE AADUKA OSUJI and RALPH
FRANCIS CAZENAVE BEY,

   **Plaintiffs,**

            v.

DEPARTAMENTO DE LA FAMILIA,
ORLANDO LÓPEZ BELMONTE and
GLENDA GERENA-RÍOS,

   **Defendants.**

**CIVIL NO. 20-1545 (RAM)**

### OPINION AND PRELIMINARY INJUNCTION ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

     Pending before the Court is Plaintiffs *Motion for Preliminary Injunction* (Docket No. 44). For the reasons set out below, the request for a preliminary injunction is **GRANTED in part** and **DENIED in part**. Defendants Departamento de la Familia ("PRDF" by its English acronym), Orlando López Belmonte and Glenda Gerena-Ríos are hereby **ORDERED** to:

- Immediately assign a fully bilingual social worker to MOB's case. "Fully bilingual" means that the person has a degree of proficiency in English and Spanish that enables faithful and accurate communication in both languages without relying on translation aids.

- Ensure that third-party contractors or entities which are to render services to Plaintiffs and MOB under the State-Court approved Service Plan can deliver the services in English or are assisted by an interpreter retained by the PRDF to ensure services are not delayed.

- Generate in English all documents to be delivered by the PRDF or its contractors to Plaintiffs as part of their ongoing intervention with this family.

- Within twenty-one (21) days of entry of this ORDER, place MOB in a foster home with an **English-speaking** family or with a qualified family member, if no such foster homes are available.

## I.    PROCEDURAL BACKGROUND

On October 13, 2020, Plaintiffs Chinyere Adaaku Osuji ("Mrs. Osuji") and Ralph Francis Cazenave Bey ("Mr. Bey") (jointly "Plaintiffs") filed an *Affidavit for Writ of Habeas Corpus and Writ of Mandamus* against Defendant the Puerto Rico Department of the Family ("the PRDF"). (Docket No. 1). On December 21, 2020, they filed a *Supplemental Complaint* to add Orlando López-Belmonte and Glenda Gerena-Ríos ("Individual Defendants") as the PRDF's Secretary and as Administrator of the Administration for Children and Family ("ADFAN" by its Spanish acronym), respectively (jointly with the PRDF, "Defendants") (Docket No. 34).

Mrs. Osuji and Mr. Bey are parents to a one-year-old infant ("MOB") who was removed by the PRDF on March 11, 2020 when MOB was barely three months old. Id. ¶ 8. MOB was removed from his parents' home after the PRDF's social worker, Aracelis Ocasio-Tapia ("Ms. Ocasio"), and her supervisor Mrs. Sonia Baerga ("Mrs. Baerga"), opined that Mrs. Osuji and Mr. Bey were neglectful parents because MOB seemed underweight. Id. ¶¶ 11-12. Since March 2020, MOB has remained in the PRDF's custody and Plaintiffs aver to have had

limited in person visits with him. Id. at ¶ 13. Plaintiffs raise claims under the due process and the equal protection clauses of the Fourteenth Amendment, rights which are enforceable under 42 U.S.C. § 1983, and Puerto Rico's general tort statute, Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141. (Docket No. 34 at 9-11) ("*Complaint*").

On April 3, 2021, Plaintiffs filed a *Motion for Preliminary Injunction* ("*Motion*") accompanied by an affidavit by Mrs. Osuji. (Docket Nos. 44 and 46). Plaintiffs contend having complied with the PRDF's requirements for reunification, but the PRDF's failure to provide timely English-language resources have caused them to have to "jump through more hoops, month after month," in comparison to "Spanish-speaking parents under the supervision of the [PRDF]." (Docket No. 44 at 13). They also argue that because MOB has been assigned to institutions lacking English-speaking staff, he has not properly learned English. Id. This will severely hinder communication between Plaintiffs and MOB when they are eventually reunited. Id. Thus, the *Motion* requests the Court order Defendants to: (a) cease and desist from continuing with a policy of not providing services equal in quality and timing to non-Spanish-speaking United States citizens residing in Puerto Rico as to Spanish-speaking ones; and (b) return of physical custody of MOB to Plaintiffs while they continue to fulfill the requirements in the PRDF's service plan. Id. at 17.

In response, the Individual Defendants filed a *Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)* positing that Plaintiffs fail to state a claim under 42 U.S.C. § 1983 because the *Complaint* did not include allegations against them. (Docket No. 51 at 6). They claim to be entitled to qualified immunity because Plaintiffs failed to show how their actions violated Plaintiffs' constitutional rights. Id. at 6-8. they also argue they cannot be found liable for any constitutional violations because Plaintiffs did not state specific instances which caused these violations or instances where they were treated differently than others similarly situated. Id. at 8-12. Lastly, the Individual Defendants argue the Rooker-Feldman, Prior-Pending Action and Domestic Relations doctrines warrant the *Complaint*'s dismissal. Id. at 12-18.

On their part, PRDF filed a *Motion to Dismiss and in Opposition to Request For Injunctive Relief*. (Docket No. 52). It argues the Court lacks federal subject matter jurisdiction pursuant to the Rooker-Feldman and Colorado-River doctrines. Id. at 4-8. This because a complaint under the Child Safety, Well Being, and Protection Act ("Act 246-2011"), was filed and litigated in the Family Court of the Court of First Instance ("Family Court") and state courts retain jurisdiction over pending actions regarding the well-being of a child born in Puerto Rico, such as MOB. Id. at 4-10. Accordingly, it asserts a likelihood of success

on the merits is unlikely and Plaintiffs cannot establish irreparable harm since their main request, MOB's physical custody, is available in state court. Id. at 15-16. As to the constitutional violations, PRDF states Plaintiffs have received services through a translator, thus injunctive relief is unwarranted. Id. at 16.

In July 2021, the Court held a four-day Preliminary Injunction Hearing. (Docket Nos. 81-84). On August 4, 2021, the parties participated in a hearing in the ongoing state proceedings. (Docket No. 92). PRDF informed this Court that remote therapy services in English commenced on August 9, 2021 and that MOB's custody is still "subject to the recommendation of the psychologist after the completion" of these therapies. Id. at 2. Id. A follow-up hearing in state court is scheduled for December 6, 2021. Id.

The Individual Defendants' post-hearing brief holds that Plaintiffs' delay in filing its request precludes injunctive relief. (Docket No. 102 at 4-6). They aver Plaintiffs' success on the merits is unlikely and a balance of hardships also disfavors them. Id. at 6-9. Lastly, Plaintiffs' request is allegedly moot because Defendants are providing them with English-language services. Id. at 11-13.

The PRDF's post-hearing brief reiterates the Court's lack of jurisdiction over the case. (Docket No. 103 at 3-7). It re-states the return of MOB's physical custody is available via the pending Puerto Rico court proceedings and Plaintiffs have not shown a

likelihood of success on the merits. Id. at 10, 12-13. It also avers that, when evaluating the balance of hardships, this Court should side with the interests of the state which is that Plaintiffs must first receive psychological treatment before regaining custody of MOB. Id. at 15. The PRDF argues it is not in the public's interest for this Court to interfere in a state matter such as family intervention. Id. It also denies Plaintiffs have not been provided with the same services as Spanish-speaking parents because they have had interpreters during the state proceedings. Id. at 16. Thus, their constitutional rights are protected. Id. Lastly, it argues Mr. Bey's request for injunctive relief should be dismissed since no evidence was presented as to his irreparable harm. Id. at 18.

Plaintiffs' post-hearing brief maintains they have shown a likelihood of success on the merits as to all their claims. (Docket No. 104 at 15-40). First, the PRDF failed to provide them with adequate English-language services which affects their substantive due process rights as it has been detrimental to their and MOB's interests, primarily stemming from the PRDF's lack of a language policy. Id. at 18-29. Second, there is a likelihood of success as to their procedural due process claims since they have been denied an opportunity to be heard due to a lack of adequate English-language services during the state proceedings. Id. at 33-34. Third, there is a likelihood of success as to their equal

protection claim because Defendants failed to maintain any case-management policies involving monolingual English-speaking parents. Id. at 34-40. Finally, Plaintiffs affirm they face irreparable harm if the injunction is withheld, the balance of hardships favors them, and it is in the public's interest for the Court to transfer custody of MOB to Plaintiffs or a legal guardian until the state action concludes. Id. at 40-43.

## II.   FINDINGS OF FACT

Fed. R. Civ. P. 52(a) requires that courts state the findings that support its decision in granting or refusing an interlocutory injunction. Since this opinion and order is for a preliminary injunction request, the findings of fact and conclusions of law are subject to change after a full hearing on the merits of the case. *See* Francisco Sánchez v. Esso Standard Oil Co., 572 F.3d 1, 15 (1st Cir. 2009). Simply put, the Court is not prejudging the ultimate resolution of the merits of case. Having analyzed the relevant pleadings on the docket, the Court makes the following findings of fact:[1]

1.   Plaintiffs are United States citizens residing in Puerto Rico since January 2019. (Docket No. 104 ¶ 1).

2.   Plaintiffs speak English, and Mrs. Osuji also speaks Igbo, one of Nigeria's principal languages. Id. ¶ 2.

---

[1] References to a Finding of Fact shall be cited as follows: (Fact ¶__).

3.  Plaintiffs are parents to an infant son, MOB, who was born on November 23, 2019 in Puerto Rico. (Docket Nos. 104 ¶ 3; 107-1 at 22).

Removal of MOB and Initial Interactions with PRDF

4.  Ms. Ocasio was the PRDF social worker assigned to MOB's case in February 2020. (Docket No. 107-4 at 5-6).

5.  The PRDF's intervention with Plaintiffs and MOB occurred when Ms. Ocasio opined that Plaintiffs were neglectful because MOB was underweight by one pound. (Docket No. 104 ¶ 6; 107-1 at 35).

6.  Ms. Ocasio testified she attempted to visit Plaintiffs before MOB's removal but was unable to contact them. (Docket No. 107-4 at 6).

7.  She sought an Emergency Removal Order on March 10, 2020. Id. at 15.

8.  She testified she attempted to go to Plaintiff's residence on March 10, that is "before going to court," but Plaintiffs "did not want to talk." Id.

9.  She further admitted she "did not tell [Plaintiffs] that [she] [was] going to ask to have their child removed." Id.

10.  Ms. Ocasio also admitted that on March 10, she did not give Plaintiffs any documents nor "a copy of [her] request to the Court to have their child removed on an emergency basis." Id. at 15-16.

11.  Ms. Ocasio conceded that when she filed the Emergency removal, "Plaintiffs did not have any information that [she] [was] seeking that emergency removal." Id. at 16.

12.  The PRDF officials removed MOB from Plaintiffs' physical custody on March 11, 2020. (Docket No. 104 ¶ 4).

13.  On that date, MOB was just over three months old. Id. ¶ 5.

14.  The initial court hearing regarding MOB's removal pursuant to Act 246-2011 was scheduled for March 19, 2020. (Docket No. 107-1 at 59).

15.  It was rescheduled for April 23rd due to the Government shutdown on March 15, 2020. Id.

16.  The April 23rd hearing did not take place due to issues with the translation services. Id.

17.  The hearing was rescheduled for mid-May but it was also canceled due to issues regarding translation services as well as issues with who could hear and who could not hear the video conference. Id. at 59-60.

18.  When Plaintiffs finally had an initial court hearing regarding the removal proceedings, Mr. Bey's state attorney had to provide translation equipment because the translator did not have her own. Id. at 60.

19.  Mrs. Osuji testified that after March 19, 2020, the initial date of the first hearing which did not take place, Plaintiffs participated in about ten state court hearings

before MOB's removal was ratified in October 2020. Id. at 62.

20.  Ms. Brenda Soulette-Vélez ("Ms. Soulette-Vélez") was the social worker originally assigned to MOB's case after his removal. (Docket No. 104 ¶ 8).

21.  She testified she has a "tourist" level of English, thus needing the help of co-workers and occasionally Google Translate or dictionaries when communicating with Plaintiffs. Id.

22.  From 2014 through 2021, this has been Ms. Soulette-Vélez's only custody removal case involving monolingual English-speaking parents. (Docket No. 104 ¶ 9; 107-3 at 5).

23.  Ms. Soulette-Vélez testified she has two colleagues that speak better English than her, but she does not know why MOB's case was not assigned to an English-speaking social worker. (Docket No. 107-2 at 72-73).

24.  Ms. Julitza Valdés-González ("Ms. Valdés-González") works as Social Worker Regional Supervisor of the Special Investigation Unit of the PRDF San Juan region. (Docket No. 107-3 at 79).

25.  She supervises Mrs. Baerga who then supervises Ms. Ocasio. Id. at 81.

26.  She admitted there are social workers who handle cases
     without an interpreter when working with families that do
     not speak Spanish. Id. at 97-98.

27.  She also stated that "being able to master the English
     language or any other language is not a requirement of the
     position of social worker in [the PRDF]." Id. at 99.

28.  She explained that assigning a social worker who "has the
     advantage of speaking English" is based on availability of
     the social worker. Id. at 105.

29.  After MOB's March 11, 2020 removal, , Plaintiffs did not
     see him until June 30, 2020. (Docket No. 104 ¶ 10).

30.  The PRDF has allowed Plaintiffs to have limited in-person
     visits with MOB, which until recently almost always took
     place at the offices of the Department of Homeland
     Security. Id. ¶ 11.

31.  Plaintiffs were not provided with any other location
     options for the visits. (Docket No. 107-1 at 65).

32.  Throughout the state proceedings, Plaintiffs have sought
     to comply with the PRDF's requirements in the Service Plan
     provided by Ms. Soulette-Vélez, but Mrs. Osuji testified
     they have been required to "do services outside of that
     service plan." (Docket No. 104 ¶ 13; 107-1 at 114).

33.   The services "outside" of the service plan included therapy
      sessions to strengthen Plaintiffs' parental capacity.
      (Docket No. 107-1 at 115).

PRDF's Requirements for Parenting Courses

34.   Defendants required that Plaintiffs take courses on child
      rearing and nutrition as part of the requirements for
      reunification with MOB. However, the PRDF failed to provide
      Plaintiffs with English-language resources to do so.
      (Docket No. 104 ¶ 17).

35.   The PRDF referred Plaintiffs to LM Mental Health to
      received parenting classes, but the LM Mental Health
      courses were given in Spanish and the entity lacks English-
      speaking staff. (Docket Nos. 104 ¶ 22; 107-1 at 88).

36.   Therefore, Plaintiffs signed up for online nutrition, child
      rearing and parenting courses offered by Stanford and Yale
      Universities in English. (Docket No. 104 ¶ 18).

37.   Plaintiffs submitted the certificates of completion for
      these courses to the PRDF. Id. ¶ 20.

38.   Defendants determined those courses could not count towards
      the completion of service requirements because they were
      missing aspects that were covered by LM Mental Health's
      courses. (Docket Nos. 104 ¶ 21; 107-1 at 89-90).

39. For example, the Yale and Stanford courses allegedly did not cover Act 246-2011 or domestic violence. (Docket No. 107-1 at 90).

40. Plaintiffs then took a domestic violence course approved by the Department of Children and Families in several states such as Florida, but they were told it was inadequate. Id.

41. Thus, Plaintiffs had to enroll in the courses offered by LM Mental Health, despite it lacking English-speaking staff. (Docket No. 104 ¶ 22).

42. At LM Mental Health, Plaintiffs had to "work[] [their] schedules around" so courses could be provided to them by student interns who did not have the required degrees, but spoke some English. Id. ¶ 23.

43. Mrs. Osuji testified the courses at LM Mental Health were "dependent on [LM Mental Health] having an intern that spoke English . . . [and] [w]hen there was not an intern available, [Plaintiffs] could not take classes. [LM Mental Health] would postpone the courses for two weeks to accommodate" finding an intern. (Docket No. 107-1 at 95).

44. Plaintiffs completed the courses at LM Mental Health with the intern on April 9, 2021. Id.

## Defendants Failure to Abide by Act 246-2011 Deadlines

45. Under Act 246-2011, the PRDF had 72 hours from MOB's removal on March 11, 2020, to appear in court, but the first hearing was scheduled for March 19, 2020. (Docket No. ¶ 25).[2]

46. The entire custody proceeding should not exceed six months. Id. ¶ 26.[3]

47. Defendants failed to abide by the deadlines set forth in Act 246-2011. Custody proceedings are currently ongoing and have lasted nineteen (19) months since MOB's removal. Id. ¶ 24.

## Lack of English Language Services During Custody Proceedings

48. The PRDF did not provide its agents with resources or equipment necessary to communicate adequately with monolingual English-speaking families. Id. ¶ 27.

49. It did not get accurate translations of the documents it provided Plaintiffs with during MOB's Act 246-2011 removal proceedings. Id. ¶ 28.

---

[2] The relevant part of Act 246-2011, Article 15(3), states that if the social worker "[o]rder[s] the immediate removal of the minor from the home where he/she is" the PRDF "may keep the minor for up to seventy-two (72) hours without having to appear in court." P.R. Laws Ann. tit 8, § 1122.

[3] The relevant part of Act 246-2011, Article 78, states that the court "shall hold a final disposition hearing of the case within a term that shall not exceed six (6) months from the date of notification" and that "[i]n any case decided pursuant to the provisions of this chapter, the court shall rule in favor of the best interests of the minor[.]" Id. § 1197.

50.  During the initial removal, Ms. Ocasio gave Plaintiffs a
     document with guidance regarding Act 246-2011, the law
     governing MOB's removal process. Id. at ¶ 29.

51.  The document, which contained an unofficial English
     translation of Act 246-2011 information, stated that by
     signing it, a parent would waive their right to counsel,
     custody of their child and personal rights. Id. ¶ 30.

52.  Plaintiffs did not sign the document. Id.

53.  Ms. Valdés-González admitted that when the PRDF provides
     this form to families, they are not asking them to give up
     their right to counsel, to custody or personal rights and
     she did not know why the form with the English translation
     stated that. (Docket No. 107-3 at 112).

54.  Plaintiffs also refused to sign a Spanish-language Service
     Plan provided by the PRDF during an August 4, 2020 state
     court hearing since they could not understand it. (Docket
     Nos. 104 ¶ 32; 107-1 at 77).

55.  It was not until around December 23, 2020, after a
     mediation session ordered by this Court before United
     States Magistrate Judge Marcos López, and in compliance
     with orders from the Magistrate Judge, that the PRDF
     provided Plaintiffs with an English-language Service Plan.
     (Docket Nos. 31; 104 ¶ 33).

56.   However, this Plan was poorly translated and allegedly
      contained statements indicating Plaintiffs were negligent
      and had anger management issues. (Docket Nos. 85-3; 104 ¶
      34; Docket No. 107-1 at 85).

57.   Thus, Plaintiffs refused to sign that Plan as well. (Docket
      No. 104 ¶ 34).

58.   On March 10, 2021, Defendants provided Plaintiffs with a
      revised English-language Service Plan, which Mrs. Osuji
      signed. (Docket No. 85-7).

Failure to Provide Updates to Plaintiffs Regarding MOB's Health

59.   The PRDF has not provided Plaintiffs with information about
      MOB's health and Plaintiffs aver they do not know anything
      about MOB's health now. (Docket Nos. 104 ¶ 36; 107-1 at
      97-98).

60.   On August 11, 2020, Ms. Soulette-Vélez informed Plaintiffs
      that all in-person visits would be canceled until further
      notice, after two children at the group home where MOB was
      placed contracted COVID-19. (Docket No. 104 ¶ 37).

61.   However, the PRDF never told Plaintiffs if MOB had
      contracted COVID-19 or what procedures the group home would
      take, if any, when a COVID-19 outbreak occurs. (Docket No.
      107-1 at 81).

Lack of English-language Resources for Plaintiffs and MOB

62.  The PRDF has not considered placing MOB with Plaintiffs'
     English-speaking family members, despite having been
     contacted by several of them. (Docket No. 104 ¶ 41).

63.  The PRDF did not place MOB in an English-speaking group
     home either. Id. ¶ 42.

64.  Ms. Soulette-Vélez admitted the PRDF has group homes where
     almost all children speak English, but MOB was ineligible
     because of his age. (Docket No. 107-2 at 92).

65.  In October 2020, the PRDF relocated MOB to a second group
     home in the Municipality of Isabela. (Docket No. 104 ¶ 43).

66.  Ms. Soulette-Vélez admitted that although she was told some
     of the staff at the Isabela group home spoke English, she
     does not have any documentation stating their level of
     English proficiency. (Docket No. 107-2 at 36-37).

67.  She also testified she has no recollection of recording
     either group home's compliance with her verbal instructions
     that MOB be addressed in English. Id. at 36, 51-55.

68.  Ms. Soulette-Vélez testified she does not know whether
     there were other children in the Isabela group home who
     spoke English. Id. at 46.

69.  In December 2020, Plaintiffs moved to Aguada to be closer
     to the group home in Isabela. (Docket No. 107-1 at 99).

70.   In January 2021, Plaintiffs requested a transfer to the
      PRDF Aguada office from the San Juan office and that visits
      with MOB be held closer to Aguada. Id. at 99.

71.   The transfer was finalized in July 2021. Id.

72.   In July 2021, a new PRDF social worker based in Aguada,
      Mr. Wilfredo Lorenzo ("Mr. Lorenzo"), was assigned to MOB's
      case. Id. at 101.

73.   Mrs. Osuji testified Mr. Lorenzo allegedly speaks even less
      English than Ms. Soulette-Vélez and that he does not speak
      English "at all." Id.

74.   On July 12, 2021, Mr. Lorenzo provided Plaintiffs with a
      third Visit Plan. (Docket Nos. 85-5; 107-1 at 102).

75.   This Plan extends visits between Plaintiffs and MOB until
      November 19, 2021. (Docket Nos. 85-5; 104 ¶ 48).

76.   Mr. Lorenzo has since provided Plaintiffs with a fourth
      Visit Plan extending visits until December 3, 2021. (Docket
      Nos. 104 ¶ 49; 106-2).

77.   Mrs. Osuji testified that from April 2021, when they
      finished evaluations with an English-speaking
      psychologist, until at least the preliminary injunction
      hearing, the PRDF had been unable to find a therapist who
      spoke English in the Aguada area. (Docket No. 107-1 at 102-
      103).

78.  Mr. Lorenzo requested that Plaintiffs sign consent letters
     in Spanish regarding ongoing therapy sessions, which
     Plaintiffs refused to do until a translation was provided.
     (Docket No. 106-1).

79.  After being told that the organization SEPY, the entity
     which the PRDF referred Plaintiffs for therapy, would not
     be providing said consent letters in English, Mrs. Osuji
     had to request that her attorney translate the documents.
     Once that occurred, she signed them. Id.

80.  The PRDF does not have any policies or protocols to guide
     its employees on how to grapple with cases involving
     monolingual English-speaking parents. (Docket No. 104 ¶
     56).

81.  Ms. Valdés-González admitted the PRDF's policies and
     procedures and "most" PRDF forms are in Spanish. (Docket
     No. 107-3 at 93).

82.  Ms. Soulette-Vélez admitted that when she was assigned
     MOB's case, she was given instructions in a meeting with
     her supervisor and other PRDF staff and via e-mail to use
     an interpreter whenever she interacts with families who do
     not speak Spanish. (Docket No. 107-2 at 18-21).

83.  But the e-mail did not reference any regulation or
     provision dealing with language or interpreters. Id.

84.   She admitted she has not seen a written norm for handling
      cases involving non-Spanish speaking parents. Id. at 23.

85.   Until 2021, when ADFAN's Administrator sent social workers
      and their supervisors a letter via email containing
      instructions regarding the use of translators, the PRDF
      did not have any written policies or procedures requiring
      that social workers use a translator for support with non-
      Spanish speaking parents. (Docket No. 104 ¶ 57).

86.   Ms. Valdés-González explained she did not have any meetings
      with the person who sent the letter, no one explained why
      the letter was sent, nor did she receive any training
      regarding its contents. (Docket No. 107-3 at 84).

87.   She also affirmed that if she did not receive training
      regarding the contents of the letter, it would be "correct
      to say that none of the people [she] supervised received
      training regarding the contents of that letter." Id.

88.   Ms. Valdés-González admitted that the trainings she
      provides to social workers and supervisors do not "involve
      practices and procedures to handle issues arising from
      parents that do not speak Spanish." Id. at 90.

89.   She also conceded the trainings do not include "any
      article, books or treatises on how to handle cases
      involving families that do not speak Spanish." Id. at 91.

90. Ms. Soulette-Vélez denied that MOB's "ability to communicate in the same language as his parents is critical to the reunification of the family." (Docket No. 107-2 at 46).

91. But Ms. Valdés-González later admitted that "for purposes of reunification, it is important for the parents and their child to be able to communicate in the same language." (Docket No. 107-3 at 91).

92. During the summer of 2021, the PRDF relocated MOB a third time to live with a foster family who allegedly does not speak English. (Docket No. 104 at 3).

93. Given that MOB has mostly been exposed to the Spanish language, he now only answers to that language. When Plaintiffs speak to him in English, "its clear confusion." (Docket No. ¶ 46).

### III. LEGAL STANDARD

**A.** *Younger* **Abstention**

In Younger v. Harris, the Supreme Court ruled that federal courts should abstain from intervening in ongoing state criminal proceedings. *See* Younger v. Harris, 401 U.S. 37 (1971). Subsequently, this doctrine has been extended and applied by the First Circuit to civil judicial proceedings "and is most commonly applied to suits seeking declaratory or injunctive relief." Verizon New England, Inc. v. Rhode Island Dep't of Lab. & Training,

723 F.3d 113, 116 (1st Cir. 2013). The Supreme Court further clarified that "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72 (2013) (citation omitted).

The Younger doctrine, "based on the principle of comity, instructs that federal courts should not interfere with ongoing state court or administrative proceedings." Marietti v. Santacana, 111 F. Supp. 3d 129, 132 (D.P.R. 2015). As a result, courts have developed a three-part test for determining whether abstention under Younger is proper. See Coggeshall v. Massachusetts Bd. of Registration of Psychologists, 604 F.3d 658, 664 (1st Cir. 2010). Abstention applies when the following conditions are met: "(1) the proceedings are judicial (as opposed to legislative) in nature; (2) they implicate important state interests; and (3) they provide an adequate opportunity to raise federal constitutional challenges." Arana-Santiago v. Universidad de Puerto Rico en Utuado, 2019 WL 6330814, at *2 (D.P.R. 2019) (quotation omitted).

**B. Preliminary Injunction Standard**

Fed. R. Civ. P. 65(a) authorizes courts to issue preliminary injunctions upon notice to the adverse party. When faced with a motion for a preliminary injunction, district courts must assess the following four elements:

> (1) the likelihood of success on the merits;
> (2) the potential for irreparable harm if the
> injunction is denied; (3) the balance of
> relevant impositions, i.e., the hardship to
> the nonmovant if enjoined as contrasted with
> the hardship to the movant if no injunction
> issues; and (4) the effect (if any) of the
> court's ruling on the public interest.

Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151,

162 (1st Cir. 2004) (quotation omitted).

## IV.  DISCUSSION

### A. Abstention doctrines are inapplicable in the present case

Pursuant to Younger, "a federal court must abstain from
hearing a case if doing so would 'needlessly inject' the federal
court into ongoing state proceedings." Coggeshall, 604 F.3d at 664
(quoting Brooks v. N.H. Supreme Court, 80 F.3d 633, 637 (1st Cir.
1996)); see also Rossi v. Gemma, 489 F.3d 26, 37 (1st Cir. 2007)
(noting the "threshold Younger issue" is whether "the requested
relief interfere[s] with an ongoing judicial proceeding[.]")
(emphasis in original). But Plaintiffs are not requesting this
Court enjoin the state proceedings. Instead, they are arguing their
constitutional rights were violated during the Act 246-2011
removal proceedings and ongoing state proceedings by Defendants.
As such, their preliminary injunction request is **not** foreclosed by
Younger since their claims do not ask the Court to directly
interfere in ongoing proceedings. See Rio Grande Cmty. Health Ctr.,
Inc. v. Rullan, 397 F.3d 56, 70 (1st Cir. 2005) (explaining that

"interference" is "usually expressed as a proceeding that either enjoins the state proceeding or has the 'practical effect' of doing so.") (citation omitted).

The Court may address Plaintiffs' claims without stepping on the state interest in the child's well-being and protection. Just as in the Sixth Circuit case Alexander v. Rosen, Plaintiffs here do not "ask [the Court] to regulate 'the day-to-day conduct of state hearings[.]'" Alexander v. Rosen, 804 F.3d 1203, 1207 (6th Cir. 2015) (citation omitted) (holding inapplicable the Younger abstention doctrine where a plaintiff averred that a federal judge, a Michigan family court judge, and state employees conspired against him to impose a child support award). Cf. Rossi, 489 F.3d 26, 35 (applying the Younger doctrine because if appellants regained funds from the court registry, "they will deprive the Superior Court of its ability to satisfy any claim that [appellees] might have against the funds").

Lastly, the Court disagrees with Defendants' allegations that Rooker-Feldman is applicable here. (Docket Nos. 51 at 12-18; 52 at 4-8; 103 at 3-4). This doctrine precludes "the losing party in state court [from filing] suit in federal court after the state proceedings [have] ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment." Coggeshall, 604 F.3d at 663 (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291 (2005))

(modifications in original). Thus, a "condition precedent" to this doctrine is that when the federal-court suit is commenced, "**the state-court proceedings have ended**." Id. at 663-64 (quotation omitted) (emphasis added).

The parties recognize the state court proceedings, and the service plan, are ongoing. (Docket Nos. 102 at 10; 103 at 6-7; 104 at 24). There is a follow-up hearing in the state court case on December 6, 2021 and the current service plan is in effect until at least December 2021. (Fact ¶ 76; Docket No. 92 at 2). Although the PRDF argued Rooker-Feldman should apply, its brief acknowledged that "**[t]here is still a pending case before the [Family Court] to evaluate the Plaintiffs' compliance with the service plan**" where they must show "**they have the protective capacities for a safe return of**" MOB to their custody. (Docket No. 103 at 5 and 9) (emphasis added). Therefore, Rooker-Feldman is inapplicable here.

Lastly, PRDF also contended abstention was proper under the Colorado River doctrine. (Docket Nos. 52 at 8-10; 103 at 5-7) (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976)). However, the contention was waived for lack of developed argumentation. *See* L. CV. R. 7(a); *see also* United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding that "[i]t is not enough merely to mention a possible argument in the

most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.")

**B. Plaintiffs Preliminary Injunction**

For reasons discussed at length below, the Court **grants in part** and **denies in part** the pending *Motion* at Docket No. 44. First, as to Plaintiffs' request that Defendants "cease and desist from continuing with a policy of not providing equal services in quality and timing to non-Spanish-speaking United States citizens residing in Puerto Rico as to Spanish-speaking citizens [,]" the Court **GRANTS** said request. (Docket No. 44 at 17). The Court finds that Plaintiffs have shown a likelihood of success on the merits as to allegations of violations to the due process and the equal protection clauses of the Fourteenth Amendment. (Docket Nos. 1 and 34). However, the Court **DENIES** Plaintiffs' additional request, the "return of physical custody of MOB to Plaintiffs while they continue to fulfill the requirements in the PRDF's service plan." Id. The Court **WILL NOT** interfere with the Family Court's decision to remove MOB from Plaintiffs' custody.

The Court cannot fathom how Plaintiffs and MOB can have a successful reunification after almost a year and a half following MOB's removal, which Defendants have always alleged is their end goal, if they cannot communicate in the same language. Placing MOB with an English-speaking foster family or family member, will be crucial to jumpstarting MOB's knowledge of the English language.

More so considering that per Mrs. Osuji's testimony, as of now English is practically a foreign language to him. (Fact ¶ 93).

## 1. Likelihood of success on the merits

The "likelihood of success" factor "is 'the touchstone of the preliminary injunction inquiry.'" Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008) (quoting Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998)). If a moving party cannot demonstrate this, "the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). When analyzing a plaintiffs' likelihood of success on the merits, district courts are only required to find its conclusion "falls within a range of reasonably probable outcomes." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir. 2013).

The Due Process clause of the Fourteenth Amendment "prohibits a state from depriving any person of 'life, liberty, or property, without due process of law,'" and has both a substantive and a procedural component. Gonzalez-Fuentes v. Molina, 607 F.3d 864, 879 (1st Cir. 2010) (quoting U.S Const. amend. XVI, § 1). The Supreme Court has held that it protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000); see also Suboh v. Dist. Attorney's Off. of Suffolk Dist., 298 F.3d 81, 91 (1st Cir. 2002). Thus, this liberty interest is protected

by both "the substantive component of the Due Process Clause, which constrains governmental interference with certain fundamental rights and liberty interests, and by the procedural component of the Due Process Clause, which guarantees 'fair process.'" Id. (quoting Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Plaintiffs bring forth claims under both components, but they recognize their claims mainly fall under violations to their *substantive* due process rights. (Docket No. 104 at 15).

 *a. Substantive Due Process*

 "The due process right of parental autonomy [and their violation] might be considered a subset of a broader substantive due process right of familial privacy." Ortiz v. Jimenez-Sanchez, 98 F. Supp. 3d 357, 368 (D.P.R. 2015) (quoting Parker v. Hurley, 514 F.3d 87, 102 (1st Cir.2008)). Under a substantive due process analysis, courts focus on "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Irish v. Maine, 849 F.3d 521, 526 (1st Cir. 2017) (quoting City of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). Whether a certain behavior is "shocking to conscience" varies on a case-by case basis. *See* Rivera v. Rhode Island, 402 F.3d 27, 36 (1st Cir. 2005) (citation omitted). When a professional standard of care is applied, liability will only be imposed when "the decision by the professional is such a substantial departure from accepted professional judgment,

practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Connor B. ex rel. Vigurs v. Patrick, 774 F.3d 45, 54 (1st Cir. 2014) (quoting Youngberg v. Romeo, 457 U.S. 307, 323 (1982)). Yet "where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice" to meet the "shock the conscience" standard. Irish, 849 F.3d at 526 (quotation omitted).

The Court understands Plaintiffs have shown a likelihood of success on the merits over their substantive due process claims. Defendants have failed to provide any explanation as to why they cannot provide timely and adequate English-language services to monolingual English-speaking parents such as Plaintiffs. Instead, the first and longest serving social worker assigned to the case, Ms. Soulette-Veléz, disdainfully testified she does not believe "[MOB's] ability to communicate in the same language as his parents is critical to the reunification of the family." (Fact ¶ 90). This assertion was belied by Ms. Valdés-González who readily acknowledged that knowing the same language *is* important to the reunification of the family. (Fact ¶ 91).

### i.  Infringement of Plaintiffs' right to educate MOB in English

Despite Plaintiffs' insistence on their right that MOB be taught and addressed to in English, Defendants' failure to meet

said request *has* affected Plaintiffs' substantive rights in educating MOB in the language of their choosing. (Fact ¶ 66). This, in contravention of a constitutional norm in place for almost a century. *See* Meyer v. Nebraska*,* 262 U.S. 390 (1923). In Meyer, the Supreme Court declared unconstitutional a prohibition on teaching school children a foreign language (German) because it interfered with "with the opportunities of pupils to acquire knowledge" and **"with the power of parents to control the education of their own."** Id. at 401 (emphasis added). But here, Defendants are not trampling on rights of parents who want their child to acquire a foreign language. Instead, the language at issue is English, one of **two official languages** of the Commonwealth of Puerto Rico since 1983. *See* Zappa v. Cruz, 30 F. Supp. 2d 123, 125 n. 2 (D.P.R. 1998), aff'd sub nom. DiMarco-Zappa v. Cabanillas, 238 F.3d 25 (1st Cir. 2001) (quoting P.R. Laws Ann. tit. 1 § 59).

The substantive Due Process clause "provides heightened protection [*i.e.* strict scrutiny] against government interference with certain fundamental rights and liberty interests" including the "liberty" of being able to "direct the education and upbringing of one's children[.]" Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citing Meyer, 262 U.S. at 390 and Pierce v. Society of Sisters*,* 268 U.S. 510 (1925)). As a result, the Due Process clause "forbids the government to infringe ... 'fundamental' liberty interests *at all,* no matter what process is provided, unless the

infringement is narrowly tailored to serve a compelling state interest." Id. at 721 (quotation omitted) (emphasis in original). Lastly, "[s]trict scrutiny is a searching examination, and it is the government that bears the burden" of proof. Fisher v. Univ. of Texas at Austin, 570 U.S. 297, 310 (2013).

Here, Defendants have utterly failed to set forth a "compelling state interest" warranting its infringement of Plaintiffs' right "to direct the education and upbringing" of MOB. See Meyer, 262 U.S. at 401. While the Court does not dispute that Defendants have a competing interest in MOB's protection, it cannot advance that interest without regard for Plaintiffs' substantive due process right to instruct MOB in the language of their choice, here English. See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 51 (1973) ("Only where state action impinges on the exercise of fundamental constitutional rights or liberties must it be found to have chosen the least restrictive alternative.") Put simply, the record is rife with evidence that Defendants did not use the "least restrictive alternative" to protect MOB while safeguarding Plaintiff's substantive due process right to bring up their child in English.

Remarkably, Ms. Soulette-Vélez, the first social worker assigned to MOB's case after his removal, testified **she does not know the English proficiency of the Isabela group home staff** or if they had written instructions to speak English to MOB, as opposed

to just verbal ones. (Facts ¶¶ 66-67). **Nor does she** have any
recollection of recording either group home's compliance with her
verbal instructions that MOB be addressed in English. (Fact ¶ 67).
Similarly, she does not know whether there were other children in
the Isabela Group home who spoke English. (Fact ¶ 68). The Court
notes MOB has spent most of the past year in this group home,
specifically from October 2020 until at least the injunction
hearing in July 2021, after which he was placed with a foster
family. (Facts ¶¶ 65 and 92). Importantly, **this foster family**
**allegedly does not speak English** and Defendants have not refuted
the allegation. Id.

### ii.  Infringement of Plaintiffs' other substantive rights

As shown during the preliminary injunction hearing,
Plaintiffs' reunification efforts with MOB have been affected by
the PRDF's lack of an adequate English language policy since the
initial intervention in March 2020. The Court will address only
some of the most egregious examples in seriatim fashion. For
starters, during the initial removal proceedings, Plaintiffs were
given a form providing guidance regarding Act 246-2011, the law
governing MOB's removal process. (Fact ¶ 50). The document was so
poorly translated it stated that by signing it, a parent would
waive their right to counsel, custody of their child, and personal
rights. (Fact ¶ 51). Understandably, Plaintiffs did not sign it.
(Fact ¶ 52). Ms. Valdés-González later acknowledged the form, for

unknown reasons, was incorrectly translated and that when the PRDF provides this form to families, they are **not** asking them to give up their right to counsel or personal rights. (Fact ¶ 53).

Even the initial removal hearing itself, which per Act 246-2011 is supposed to occur within seventy-two hours of the removal, was postponed on multiple occasions due to issues with translation services. (Facts ¶¶ 14-17; Section II, *infra*, Fact ¶ 45 n.2). Defendants did not dispute the delay of the initial hearing during the preliminary injunction hearing. During the actual removal hearing, which occurred in May, the only way Plaintiffs could understand the translator was through equipment brought by Mr. Bey's own attorney because the translator did not have equipment for them to use. (Fact ¶ 18).

Plaintiffs were provided the first Spanish-language Service Plan by the PRDF in August 2020 during a state court hearing. (Fact ¶ 54). Plaintiffs refused to sign it. Id. They did not receive an English-language Service Plan until December 23, 2020, **that is eight (8) months after MOB's removal, and because a federal Magistrate Judge ordered the PRDF to do so**. (Fact ¶ 55). When arguing why Plaintiffs' claims cannot succeed on the merits, the PRDF highlighted that Plaintiffs discussed a Spanish-language visit plan, which is part of the service plan, with Ms. Soulette-Vélez and a translator. (Docket No. 103 at 13; 107-1 at 72). But they do not dispute the lengthy delay in providing Plaintiffs **with**

**an English-language Service plan.** Furthermore, even the English-language Plan provided December 2020 allegedly included language regarding Plaintiffs supposed neglectful behavior towards MOB and Plaintiffs' alleged anger management issues. (Fact ¶ 56). Therefore, Plaintiffs refused to sign it. (Fact ¶ 57). Plaintiffs ultimately received another English-language Service Plan, which Mrs. Osuji signed, on March 10, 2021, over eleven (11) months after MOB's removal. (Fact ¶ 58).

The issues Plaintiffs encountered with the PRDF's provider of the required child rearing courses is another example of how Defendants failed to offer English language resources to Plaintiffs. (Fact ¶ 34). For the requisite courses, Defendants referred Plaintiffs to the provider LM Mental Health, which did not have English-speaking staff. (Facts ¶¶ 35). As a result, Plaintiffs completed on-line courses from Stanford and Yale Universities, but Defendants stated were inadequate because these lacked certain content required by the PRDF, such as instruction on domestic violence and Act 246-2011. (Facts ¶¶ 36-39). When Plaintiffs then took a domestic violence course approved by the State of Florida, the PRDF also deemed it inadequate. (Fact ¶ 40). Plaintiffs had to ultimately enroll in LM Mental Health, which only provided classes in English via a **student intern.** (Facts ¶¶ 41-42). Mrs. Osuji further testified that classes would sometimes be postponed by two weeks because the student intern was

unavailable. (Fact ¶ 43). Consequently, Plaintiffs did not complete the required courses until April 2021. (Fact ¶ 44). Defendants did not challenge the delay in providing the courses due to the unavailability of the intern during the preliminary injunction hearing. Rather, the PRDF merely stated that the workshops were provided in English, which meant that Plaintiffs lacked success on the merits as to all their constitutional claims. (Docket No. 103 at 13).

More worrisome still is that Ms. Soulette-Vélez and Ms. Valdés-Gonzalez admitted there were not *any* policies or written norms regarding how PRDF social workers and supervisors should work with families whose first language is not Spanish. (Facts ¶¶ 80-81 and 84). Although Ms. Soulette-Vélez testified she initially received instructions from her supervisor and via e-mail to communicate with Plaintiffs in English, said instructions did not refer to any official guidance regarding language or translators. (Fact ¶¶ 82-83).

In fact, the PRDF did not have any written norms requiring the use of interpreters with non-Spanish speaking families until **2021 and after this federal lawsuit commenced on October 13, 2020**, when ADFAN sent to the PRDF's social workers and supervisors a letter via e-mail containing instructions regarding the use of translators. (Fact ¶ 85). Ms. Valdés-González further testified she did not receive any explanation as to why the letter was sent

nor any trainings as to its content. (Fact ¶ 86). She also admitted it would be correct to say that none of the PRDF staff under her supervision received training either. (Fact ¶ 87).

Other situations addressed during the preliminary injunction hearing showing that Plaintiffs have a likelihood of success on the merits in their substantive due process right claim include the fact that none of the PRDF social workers assigned to MOB's case, spoke English without interpreters, the help of coworkers or assistive technology. (Facts ¶¶ 20-21 and 72-73). **This, even though the PRDF *had* English-speaking social workers who did not need an interpreter when communicating with English-speaking families, but for unknown reasons were not assigned to MOB's case.** (Facts ¶¶ 23 and 26).

### iii. Plaintiffs have shown a likelihood of success on the merits as to their substantive due process claims.

For the foregoing reasons, the Courts finds that Plaintiffs have set forth a likelihood of success on the merits of their substantive process claims. First, they have shown the PRDF has **not** provided MOB with the resources to develop his English language skills. This, by not placing him with an English-speaking family member (Fact ¶ 62) and placing him in group homes where English is not the main language or where they are unaware of the staff's English proficiency. (Fact ¶ 66). Thus, they *likely* have

delayed MOB's English language skills which will affect his eventual reunification with Plaintiffs, who only speak English.

Plaintiffs have shown that a lack of adequate English-language services significantly delayed the state court proceedings related to MOB's removal and their compliance with the PRDF's requirements for reunification. These include the fact that even MOB's initial Act 246-2011 removal proceeding was delayed on multiple occasions due to translations issues. (Facts ¶¶ 14-17). Not to mention Defendants took almost eight (8) months since MOB's removal to provide Plaintiffs with an English-language Service Plan. (Fact ¶ 55).

The Court finds that Defendants, having "an opportunity to reflect and make reasoned and rational decisions," during the past year and a half since MOB's removal, have been **"deliberately indifferent" to Plaintiffs and MOB's needs**. *See* Irish, 849 F.3d at 526 (quotation omitted) (emphasis added). This suffices to meet the "shock the conscience" standard. *See* Rosales-Mireles v. United States, 138 S. Ct. 1897, 1906 (2018) (explaining that this standard is met "where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference.") (quotation omitted).

b. *Procedural Due Process*

Claims regarding procedural due process under § 1983 require courts determine first if plaintiffs were deprived of a liberty or property interest protected by the United States Constitution and, if so, whether the procedures causing the deprivation "were constitutionally sufficient." González-Fuentes, 607 F.3d at 886 (citation omitted). One of the lynchpin requirements of procedural due process is adequate notice and that "the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Perrier-Bilbo v. United States, 954 F.3d 413, 433 (1st Cir.), cert. denied, 141 S. Ct. 818 (2020) (quoting González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011)). When evaluating the appropriateness of the procedures employed, courts "balanc[e] a number of factors, including the nature of the private and public interests involved; the risk of erroneous deprivation accruing under the procedures used by the state; and the probable benefit of demanding additional procedural safeguards." Aponte-Rosario v. Acevedo-Vila, 617 F.3d 1, 9 (1st Cir. 2010) (quotation omitted).

As stated above, Plaintiffs allege they have a liberty interest in the care and custody of MOB. (Docket No. 104 at 24). The only issue left is whether they were afforded a suitable process. *See* Suboh, 298 F.3d at 93 (noting that "[t]he long-standing acknowledgment of a substantive due process interest in

familial integrity" was the backdrop for the opinion <u>Stanley v.</u>
<u>Illinois</u>, 405 U.S. 645, 649 (1972), which held "that procedural
due process demanded that a parent be given 'a hearing on his
fitness as a parent before his children were taken from him[.]'")

Here, a review of the record shows that Plaintiffs have shown
a likelihood they have not been "heard" properly since the
beginning of the removal proceedings. Ms. Ocasio, the PRDF social
worker assigned to investigate MOB's case prior to his removal,
testified that she attempted to contact Plaintiffs prior to
removing MOB from their home, but she was unable to do so. (Facts
¶¶ 6 and 8). She also admitted she "did not tell [Plaintiffs] that
[she] was going to ask to have their child removed" and that when
she filed the Emergency removal, "Plaintiffs did not have any
information that [she] [was] seeking that emergency removal."
(Facts ¶¶ 9 and 11). Ms. Ocasio further admitted that when she
went to talk to Plaintiffs the day before the removal, she did not
give them any documents or "a copy of [her] request to the Court
to have their child removed on an emergency basis." (Fact ¶ 10).
The Court thus finds that Plaintiffs were unaware and not on
"notice" that their child was going to be removed from them.

The First Circuit has held that due process "protects a
parent's rights even when a state temporarily removes a child
before obtaining a court order, as the state may place a child in
temporary custody only when it has evidence giving rise to a

suspicion that the child has been abused or is in imminent danger."
Suboh, 298 F.3d at 92. Even in cases of emergency removal, such as
the one in the case at bar, due process still "requires that some
sort of process be provided promptly after an emergency removal."
Id. Notably, "[i]n those extra-ordinary situations where
deprivation of a protected interest is permitted without prior
process, the constitutional requirements of notice and an
opportunity to be heard are not eliminated, but merely postponed."
Tower v. Leslie-Brown, 326 F.3d 290, 298 (1st Cir. 2003) (quotation
omitted). Either way, plaintiffs must still be provided with "an
adequate post-deprivation hearing within a reasonable time." Id.
(quotation omitted).

     In the case at bar, even if the Court accepts Defendants'
allegations that MOB was removed pursuant to an allegedly valid
Emergency Order and that Plaintiffs were on notice that his removal
was imminent, the record shows that an initial hearing post-removal
**did not occur until months after MOB's initial removal**. (Facts ¶¶
14-17). This delay was allegedly due to multiple translation
issues. Id. However, the delay is in direct contravention of Act
246-2011's requirement that no more than seventy-two (72) hours
can elapse "without [the minor] having to appear in court." Section
II, *infra*, Fact ¶ 45 n. 2). Defendants did not dispute during the
preliminary injunction hearing that Plaintiffs and MOB were not

given a post-deprivation hearing within this required seventy-two (72) hour window.

Thus, the Court finds that Plaintiffs were not given a post-deprivation hearing "within a reasonable time." *Cf.* Tower, 326 F.3d 290 (finding that parents' due process rights were not violated because they were given "a prompt and fair process" when the post-deprivation hearing took place three business-days after the children's removal and the case worker had gone to the home of a judge to seek ex parte review of the removal decision hours after the removal); *see also* Brown v. Daniels, 290 F. App'x 467, 473 (3d Cir. 2008) (collecting cases for the proposition that "[t]here is no bright-line rule for deciding whether a post-deprivation hearing is sufficiently 'prompt'"); Whisman v. Rinehart, 119 F.3d 1303, 1310 (8th Cir. 1997) (finding that an initial due process hearing held 17 days after the state had taken custody was not a "prompt hearing"). Not to mention, that per Mrs. Osuji's testimony, which Defendants did not dispute, when the hearing finally did take place Mr. Bey's attorney had to provide the translation equipment because the translator did not have her own. (Fact ¶ 18). Due to the foregoing, the Court finds that Plaintiffs have set forth a likelihood success on the merits as to their *procedural* due process claims.

c. *Equal Protection Clause*

Pursuant to the Fourteenth Amendment's Equal Protection Clause, "persons similarly situated must be accorded similar governmental treatment." Aponte-Ramos v. Alvarez-Rubio, 783 F.3d 905, 908 (1st Cir. 2015) (quotation omitted). To prove a violation under this clause, Plaintiffs must establish: "(1) [they], compared with others similarly situated, [were] selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Doble Seis Sport TV, Inc. v. Puerto Rico, 2019 WL 3820073, at *5 (D.P.R. 2019) (quoting Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (citations and internal quotation marks omitted)). A precise correlation as to whether Plaintiffs are "similarly situated" is not necessary, though they must proffer "sufficient proof on the relevant aspects of the comparison to warrant a reasonable inference of substantial similarity." Rivera-Corraliza v. Morales, 794 F.3d 208, 225 (1st Cir. 2015) (quotation omitted). "A party who asserts that governmental action violates the Equal Protection Clause must show that [they] [are] the victim[s] of intentional discrimination." Martinez Gutierrez v. Batiz, 2006 WL 8450178, at *4 (D.P.R. 2006). The protections afforded by the Equal Protection

clause encompass legislative and executive conduct. *See* <u>Pagan v. Calderon</u>, 448 F.3d 16, 34 (1st Cir. 2006) (citation omitted).

Discrimination by the Government of Puerto Rico against monolingual English speakers is not unprecedented. *See e.g.*, <u>Smothers v. Benitez</u>, 806 F. Supp. 299, 309 (D.P.R. 1992); <u>Diffenderfer v. Gomez-Colon</u>, 587 F. Supp. 2d 338, 348 (D.P.R. 2008), <u>vacated</u>, 587 F.3d 445 (1st Cir. 2009). In <u>Smothers</u>, this District held that "[t]he limitation of [plaintiff's] choices because of her monolingualism, in what is functionally a bilingual society, may constitute an arbitrary discrimination. **The use of one's language is an important aspect of one's ethnicity, and should not be sacrificed to government or business interests without good cause.**" <u>Smothers</u>, 806 F. Supp. at 309; *see also* <u>Zappa</u>, 30 F. Supp. 2d at 130 ("[W]hen state actors in Puerto Rico classify continental Americans for disparate treatment, their actions, where they fail to withstand strict scrutiny, clearly violate the Equal Protection Clause"). Moreover, this District Court has analyzed such discrimination under both the strict scrutiny and rational basis review tests. *See* <u>Smothers</u>, 806 F. Supp. at 304-309; <u>Diffenderfer</u>, 587 F. Supp. 2d at 348 (finding that Spanish-only ballots failed to surpass either strict scrutiny or rational basis review, but later vacated for mootness by the First Circuit given the enactment of legislation mandating a bilingual ballot). Given the above, **and because Plaintiffs have shown they have been**

**subject to disparate treatment by Defendants**, the Court will not address in depth which test is more applicable to their claims at this juncture.

Plaintiffs presented evidence that from the initial removal proceedings in March 2020 **until 2021 and once again, after the commencement of the federal case, the PRDF did not have any written policies or procedures requiring its social workers to use a translator when working with non-Spanish speaking parents.** (Fact ¶ 85). Defendants failed to contest this at the preliminary injunction hearing or in their post-hearing briefs. Instead, they reiterated that Plaintiffs were at all times provided with an interpreter during the state proceedings which meant that Plaintiffs lacked a success on the merits as to all their constitutional claims. (Docket No. 103 at 13). But this fact does not negate that the PRDF did not have a policy in place to help non-English speaking parents until this year. The Supreme Court has stated that all it takes for the extraordinary relief by injunction to apply is "a real threat of future violation or a contemporary violation of a nature likely to continue or recur." Lovell v. Brennan, 728 F.2d 560, 562 (1st Cir. 1984) (quoting United States v. Oregon Med. Soc., 343 U.S. 326, 333 (1952)). Furthermore, the District Court of Puerto Rico has held that "**[e]ven if the defendant has ceased wrongful activities, an injunction should be granted where defendant's intentions are in**

doubt." <u>Camilo v. Nieves</u>, 2012 WL 12995632, at \*9 (D.P.R. 2012) (citation omitted) (emphasis added). Similarly, "**[i]t has also been held that voluntary cessation of activity is not a ground for denial of a preliminary injunction**." <u>Id.</u>

Here, Ms. Valdés-González admitted the PRDF's policies and procedures are exclusively in Spanish as are "most" forms which the PRDF gives to parents which it intervenes with. (Fact ¶ 81). She also admitted that while she trains PRDF social workers and supervisors, the trainings **do not** "involve practices and procedures to handle issues arising from parents that do not speak Spanish." (Fact ¶ 88). Nor does she use articles, books or treatises regarding how to handle cases of non-Spanish speaking families. (Fact ¶ 89). Hence, Plaintiffs have shown a likelihood of success on the merits of their Equal Protection claim because they have shown the PRDF **lacks an established policy regarding how to provide adequate services to monolingual English-speaking families, such as Plaintiffs**.

In summary, **Plaintiffs have shown they have been subject to disparate treatment by Defendants**. This because Spanish-speaking parents have access to social workers, presumably accurate PRDF documents, and PRDF-selected education courses in their own language. (Facts ¶ 35 and 81). In contrast, here, even though English is a co-official language of the Commonwealth of Puerto Rico, Plaintiffs have: (1) been deprived of bilingual social

workers even though they were on staff; (2) been presented with
documents in Spanish and/or mistranslated documents and (3) were
forced to take courses in Spanish translated into English subject
to the availability of a student intern. (Facts ¶¶ 23, 26, 41-44,
50-54, 78-79). Therefore, until the PRDF establishes an effective
policy regarding how to provide adequate services to monolingual
English-speaking families such as Plaintiffs, and which puts them
on equal footing with Spanish-speaking parents which have also
been intervened with by the PRDF, there is a "contemporary
violation of a nature likely to continue." Lovell, 728 F.2d at
562. Relief by preliminary injunction is warranted.

    2. Irreparable harm

    Within the preliminary injunction context, irreparable harm
"means an injury that cannot adequately be compensated either by
a later-issued permanent injunction, after a full adjudication on
the merits, or by a later-issued damages remedy." Rio Grande
Community Health Center, Inc., 397 F.3d 56. Simply put, irreparable
harm exists when traditional legal remedies are inadequate. See
Doble Seis Sport TV, Inc., 2019 WL 3820073, at *5 (quoting Kmart
Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989));
see also Ross-Simons of Warwick, Inc., 102 F.3d at 18 ("It is
usually enough if the plaintiff shows that its legal remedies are
inadequate."). The irreparable harm must be "likely and imminent,
not remote or speculative." Birth of a New World Monument LLC v.

González Freyre, 2020 WL 6342634, at *4 (D.P.R. 2020) (quotation omitted).

Here, there is no adequate *legal* remedy that could prevent, or repair the harm caused to Plaintiffs by their separation from MOB for over a year and a half. Considering Plaintiffs have shown a likelihood on the merits of their constitutional claims, Plaintiffs carry less of a burden to prove that a continuation of this harm is likely, rather than just speculative. *See* Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) ("[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief.") (quoting EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996)).

Without a preliminary injunction, Plaintiffs will more likely than not be subject to more delays to their reunification with MOB. More so considering the latest visitation plan was extended for unknown reasons until at least December 2021. (Fact ¶ 76; Docket No. 106-2). Furthermore, the fact that MOB has been moved to a foster family who allegedly does not speak English, reinforces the fact that MOB's English-language skills will continue to be underdeveloped for the foreseeable future. Lastly, while there is a new circular letter from ADFAN, which the Court has not been privy to and which allegedly contains instructions regarding the use of translators when PRDF staff interacts with non-Spanish

speaking parents, neither supervisors such as Ms. Valdés-González nor the social workers she trains have received any training regarding this new policy. (Facts ¶¶ 86-87). Thus, the Court finds there is a risk of irreparable harm without a preliminary injunction.

### 3. Balance of hardships

When examining this third factor, "the Court must weight 'the hardship that will befall the nonmovant if the injunctions issues [...] with the hardship that will befall the movant if the injunction does not issue.'" Am. Cruise Ferries, Inc. v. Vazquez Garced, 2020 WL 7786939, at *15 (D.P.R. 2020) (quoting Mercado-Salinas v. Bart Enterprises Int'l, Ltd., 671 F.3d 12, 19 (1st Cir. 2011)). The PRDF holds that "in the balance of relevant equities, the Court must side with the State in its interest of protecting the child" which includes that Plaintiffs complete psychological therapies. (Docket No. 103 at 15). On their part, the Individual Defendants claim the third factor favors them because Plaintiffs' request "would force Defendants to prematurely halt the state court proceedings and return [MOB's] physical custody" to Plaintiffs. (Docket No. 102 at 10).

Considering the Court is **not** ordering *Plaintiffs* regain custody of MOB during the pendency of the state proceedings nor is it interfering with the "day to day" ongoings of these proceedings, the third factor favors Plaintiffs. The Court is ordering MOB be

placed in either a foster home with an **English-speaking family** or an **English-speaking family member** until the state proceedings conclude. The Court does not see how Defendants will face any significant hardships sufficient to warrant denial of the injunction. Further, the PRDF has not explained how these alternatives would harm the state's interest in protecting MOB. On the contrary, placing MOB with English speakers will facilitate reunification, the PRDF's stated goal. Lastly, without an injunction and without adequate English-language services, monolingual English-speaking Plaintiffs' ongoing interactions with the PRDF will continue to be affected which will undoubtedly lead to even more delays in state court proceedings.

4. <u>Public interest</u>

The public interest which the fourth factor refers to is "the public interest in the issuance of *the injunction itself*." <u>Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of Puerto Rico</u>, 437 F. Supp. 3d 119, 137 (D.P.R. 2020) (quoting <u>Braintree Labs., Inc. v. Citigroup Global Markets, Inc.</u>, 622 F.3d 36, 45 n.8 (1st Cir. 2010)) (emphasis in original). When analyzing this factor, the Court looks towards "a fit (or lack of friction) between the injunction and the public interest." <u>NuVasive, Inc. v. Day</u>, 954 F.3d 439, 443 (1st Cir. 2020).

Plaintiffs state the fourth factor favors them because the relief requested is "that Defendants take the necessary steps to

ensure that the government's services to English-speaking parents and children are provided promptly and of equal quality" in comparison to Spanish-speaking parents. (Docket No. 104 at 42). Whereas the PRDF argues it is not in the public's interest for this Court to interfere in a state matter such as family intervention. (Docket No. 103 at 15). On their part, the Individual Defendants aver that granting the requested relief "would impede the exercise of the duties of the [PRDF] and would interfere with" Puerto Rico's public policy. (Docket No. 102 at 11).

Beyond these conclusory allegations, however, Defendants have failed to set forth *any* evidence as to how adequate English language services to monolingual English-speaking parents such as Plaintiffs or temporary custody with an English-speaking foster family would not be in the public's interest or interfere with public policy. The Court believes offering **adequate** English-language services to monolingual English-speaking families *is* in the public's interest as it is required by law. More so, considering English is one of **two official languages** of the Commonwealth of Puerto Rico. *See* <u>Zappa</u>, 30 F. Supp. 2d at 125 n.2.

## V.   CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008). But "[c]hoices about marriage, family life, and the upbringing of children are among associational rights [the

Supreme Court of the United States] has ranked as 'of basic importance in our society' […] rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102, 116 (1996) (quoting <u>Boddie v. Connecticut</u>, 401 U.S. 371, 376 (1971)).

The Court finds that Plaintiffs are entitled to relief due to the following actions and/or omissions on behalf of Defendants:

- Defendants inexplicably **did not assign a fully bilingual social worker to Plaintiffs' case** despite the record reflecting that the PRDF has them in its staff;

- Defendants did not provide Plaintiffs with an accurate English translation of a summary of Act 246-2011 which is ordinarily provided to parents at the time of the child's removal;

- Defendants **did not hold a hearing within seventy-two (72) hours** following MOB's removal, as required by law, due to a lack of translation services;

- Defendants postponed the removal hearing on multiple occasions for lack of translation services and, at the removal hearing, did not have the proper translation equipment;

- Defendants did not provide Plaintiffs with an accurate English-language Service Plan until **eleven months after MOB's removal;**

- Defendants required that Plaintiffs take courses with a provider that **did not employ English-speaking staff or an interpreter** which meant that services to Plaintiffs were based on the availability of a student intern;

- Defendants placed MOB in foster homes where Spanish was the primary language and **did not make any efforts to ensure that MOB was receiving education or care in the English language**.

Given that all four preliminary injunction factors weigh in favor of granting relief, Plaintiffs' request for a preliminary injunction at Docket No. 44 is **GRANTED in part** and **DENIED in part**. Defendants Departamento de la Familia, Orlando López Belmonte and Glenda Gerena-Ríos are **ORDERED** to:

- Immediately assign a fully bilingual social worker to MOB's case. "Fully bilingual" means that the person has a degree of proficiency in English and Spanish that enables faithful and accurate communication in both languages without relying on translation aids.

- Ensure that third-party contractors or entities which are to render services to Plaintiffs and MOB under the State-Court approved Service Plan can deliver the services in English or are assisted by an interpreter retained by the PRDF to ensure services are not delayed.

- Generate in English all documents to be delivered by the PRDF or its contractors to Plaintiffs as part of their ongoing intervention with this family.

- Within twenty-one (21) days of entry of this ORDER, place MOB in a foster home with an **English-speaking** family or with a qualified family member, if no such foster homes are available.

Lastly, the Court waives Rule 65(c)'s bond requirement because Plaintiffs are at a financial disadvantage in litigating against Defendants, no harm will come from compelling the latter to providing adequate services in one of Puerto Rico's official languages, and imposing a bond may deprive Plaintiffs of access to judicial review. *See* Crowley v. Local No. 82, 679 F.2d 978, 1000 (1st Cir. 1982), reversed on other grounds by 467 U.S.C. 526 (1984); People ex rel. Van De Kamp v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1325 (9th Cir.1985) ("The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review").

**IT IS SO ORDERED.**

In San Juan Puerto Rico, this 27th day of September 2021.

                               S/ RAÚL M. ARIAS-MARXUACH_____
                               United States District Judge